IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | NO.  04-672 |
| | : | |
| KENNETH ADAMSON | : | |
| | : | |

**DuBOIS, J.**                                                                                                                                                **JANUARY 16, 2008**

## MEMORANDUM

**I.     INTRODUCTION**

Defendant Kenneth Adamson is charged in an Indictment with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  On June 25, 2004, the defendant, during a police interrogation, admitted that he possessed the firearm in question. Presently before the Court is defendant's Motion to Suppress Statements.  Defendant argues in the Motion that 1) he was subject to a custodial interrogation when the police interviewed him at a hospital, following a shooting in which he was involved, and that his requests for counsel were ignored; and 2) his subsequent waiver of his Fifth and Sixth Amendment rights was not voluntary, knowing, and intelligent because he was under the influence pain medications and thus lacked the mental capacity to validly waive those rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

**II.     FACTUAL BACKGROUND**

On the afternoon of June 25, 2004, the defendant was the victim of a gun shooting which took place near the intersection of Old York Road and Wyoming Avenue in Philadelphia.  After being shot in the legs, the defendant ran into a subway station at Broad Street and Wyoming

Avenue, one block from the scene of the shooting, where he was found by the police.  The defendant identified himself to the police as "Kevin Johnson."  In the subway station, the police recovered a gun lying next to a bloody footprint behind a security gate.

The defendant was transported by Emergency Medical Services ("EMS") personnel to the Albert Einstein Medical Center ("AEMC") Trauma Unit.  EMS personnel described the defendant as being alert and oriented while en route to the hospital.  EMS records show that at 4:40 p.m. the defendant's Glasgow Coma Score ("GSC") was a perfect 15.[1]

The defendant arrived at the emergency room at 4:43 p.m.  There he was met by Dr. Albert Villarin.  Dr. Villarin noted that upon arrival in the emergency room the defendant was "alert in time, space, and cognition, meaning he could function just like he would anywhere else outside of an injury" and that his "mental status and neuro exam [] was completely fine."  Hr'g Tr. 16, Aug. 8, 2006.  At 4:50 p.m., the defendant's GSC was recorded as 15, the "highest [score] you can get."  Hr'g Tr. 17, Aug. 8, 2006.  No GSC tests were later performed.  The medical staff at Albert Einstein determined that the defendant did not require surgery for his gunshot wounds.

At 5:15 p.m. the defendant was given four (4) milligrams of morphine for pain.  Dr. Villarin testified that four milligrams is a "standard dose" for a person weighing 70 kilograms or more[2] and that it is "enough to take the edge off the pain but not enough to make [a person] unconscious or stop breathing."  Hr'g Tr. 24-25, Aug. 8, 2006.  According to the doctor's notes,

---

[1] A Glasgow Coma Score is a measure of three major parts of cognitive function: the ability to spontaneously open eyes, speak, and perform motor functions.  See Hr'g Tr. 50-51, Aug. 8, 2006.

[2] 70 kilograms is equal to 154 pounds.  At the time of the shooting, the defendant weighed about 100 kilograms, or 215 pounds.  See Hr'g Tr. 30, Aug. 8, 2006.

the morphine had no effect on the defendant's cognitive abilities.  Hr'g Tr. 31, Aug. 8, 2006.  Dr. Villarin also testified that the half-life of morphine is two to four hours, depending on a person's metabolism, weight, liver function, and activity.  Hr'g Tr. 31, Aug. 8, 2006.

At 5:50 p.m., the defendant was given two Percocet tablets.  Hr'g Tr. 33, Aug. 8, 2006.  According to Dr. Villarin, the Percocet was given to the defendant "to allow him to have just sustained pain control after discharge."[3]  Hr'g Tr. 32, Aug. 8, 2006.  Dr. Villarin testified that the Percocet helped the defendant "deal with the pain of the injuries rather than change [his] mental status."  Hr'g Tr. 33, Aug. 8, 2006.  He further testified that it is customary to give patients pain medication "right before leaving" because sometimes patients have difficulty filling prescriptions after discharge "if they go some place else rather than to their home."  Hr'g Tr. 32, Aug. 8, 2006.  Dr. Villarin stated that the half-life of Percocet "depends on the patient" but "runs in about" four to six hours.[4]  Hr'g Tr. 34, Aug. 8, 2006.   The doctor also testified that the defendant's blood pressure never changed; that he never became hypoxic; and that his heart rate remained constant throughout the duration of his stay at the hospital.  Hr'g Tr. 32, Aug. 8, 2006.[5]

---

[3]    Nurse Mulholland testified that the defendant was given Percocet "because the initial dose [the morphine] was not taking care of his pain."  Hr'g Tr. 112, Aug. 8, 2006.

[4]    Different experts have provided different estimates regarding the half-life of Percocet.  Dr. Richard Cohn, a toxicologist and witness for the government, stated that "oral administration of [Percocet] has a peak action probably somewhere in the vicinity of between an hour or two of its administration orally."  Hr'g Tr. 101, Dec. 17, 2007.  Dr. Frederick Goldstein, an expert for the defense, agreed with Dr. Cohn, Hr'g Tr. 135, Dec. 17, 2007, and also testified that "both [morphine and Percocet] have a relatively long duration of action extending into four, five hours' worth."  Hr'g Tr. 133, Dec. 17, 2007.

[5]    The Court notes that these vital signs were recorded at three times - 4:40 p.m., 4:50 p.m., and 5:50 p.m.  See Gov't Ex. 1.  Morphine was administered to the defendant at 5:15 and Percocet at 5:50.  The Court further notes that there was a slight increase in pulse when the vital signs were taken after the administration of morphine.

The nurse who participated in the defendant's treatment at AEMC, Christin Mulholland, also testified. Nurse Mulholland's role was to document the initial phases of the trauma and then provide "hands-on care once the trauma is stabilized." Hr'g Tr. 111, Aug. 8, 2006. In the course of her treatment of the defendant, Nurse Mulholland never observed any change in the defendant's cognitive abilities, even after he was given pain medications. Hr'g Tr. 113, Aug. 8, 2006. She testified that the defendant was alert and oriented, did not mumble or doze off, did not seem confused, and was never unconscious. Hr'g Tr. 113, Aug. 8, 2006. At the time of his discharge, the defendant appeared to Nurse Mulholland to be cognitively stable. Hr'g Tr. 113, Aug. 8, 2006.

During the course of his treatment at the hospital, the defendant was questioned by Detective Robert Brady. Again, the defendant gave his name as "Kevin Johnson." Hr'g Tr. 83, Aug. 8, 2006. Detective Brady testified that the purpose of his questioning the defendant was to investigate the shooting at Broad and Wyoming and that the defendant was "coherent, he was answering my questions about the shooting." Hr'g Tr. 126, Aug. 8, 2006. He also testified that the defendant never requested an attorney and never expressed a desire to stop the interview. According to Detective Brady, no family members were in the room at the time of the interview. He testified that the interview "wasn't very long . . . probably not even more than ten, 15 minutes." Hr'g Tr. 127, Aug. 8, 2006.

At 6:29 p.m., the defendant was discharged from the hospital to the custody of the Philadelphia police, who transported him to the Northwest Detective Division. At the time of his discharge, Nurse Mulholland observed that the defendant was "was ambulatory and alert and verbalized that he understood what was, you know, going to happen with his care after leaving

the emergency room." Hr'g Tr. 112-114, Aug. 8, 2006.

At the Northwest Detective Division, the defendant was met by Detective Leonard Azzarano, who read him his Miranda rights and obtained a written waiver of those rights from the defendant. Detective Azzarano interviewed the defendant from approximately 7:15 p.m. until 7:40 p.m. When asked if he was under the influence of drugs or alcohol, the defendant responded "nope." See Gov't Ex. 4. During the interview, the defendant admitted that he was in possession of the gun found at the subway station by the police. At 7:40 p.m., the defendant concluded the interview by stating "I don't want to talk anymore." See Gov't Ex. 4.

### III.     DEFENDANT'S MOTION TO SUPPRESS STATEMENTS/EVIDENTIARY HEARINGS

The defendant filed a Motion to Suppress Statements. He contends that his constitutional rights were violated in two ways. First, the defendant argues that he was in the de facto custody of the police while he was at the hospital and that he requested an attorney during his interview with Detective Brady. Def.'s Mem. 1-2. He further claims that the detective ignored those requests and continued to question him. Second, the defendant argues that, while at the police station, he was never read his Miranda rights and that, even if they were administered, he did not knowingly or intelligently waive those rights because he was under the influence of pain medication administered at AEMC. Def.'s Mem. 4.

Two evidentiary hearings were held on the Motion to Suppress Statements. The first hearing took place on August 8, 2006. During that hearing, the Court received in evidence an expert report by Dr. Pogos Voskanian, a Board Certified Neuro-Psychiatrist hired by the

defendant.  Hr'g Tr. 167, Aug. 8, 2006.  In the report, dated June 8, 2006, Dr. Voskanian states, "It is my opinion, with a reasonable degree of medical certainty that, at the time when Mr. Adamson provided a statement to the police on June 25, 2004, he lacked the mental capacity to waive his constitutional rights, lacked the mental capacity to waive his Miranda rights, and lacked the mental capacity to sign a document in a consensual manner."  No experts testified for the government at that hearing.

The defendant also testified at the August 8, 2006 hearing.  He testified that after falling down in the subway station, the next thing he remembered was waking up at the hospital.  Hr'g Tr. 147, Aug. 8, 2006.  He claimed he was in pain and crying while at AEMC but that the medications helped ease the pain "a little bit."  Hr'g Tr. 147, Aug. 8, 2006.  The defendant claims to have no recollection of leaving the hospital in police custody.  Hr'g Tr. 150, Aug. 8, 2006.  He also claims to have been tired and sleepy during his interview at the police station.  Hr'g Tr. 151, Aug. 8, 2006.

A second hearing was held on December 17, 2007.  At that hearing, Dr. Frederick Goldstein, a pharmacologist, testified for the defense that, based on his review of the medical records, the defendant's statement to Detective Azzarano, and the relevant sections of the defendant's testimony and that of Dr. Villarin, it was his opinion that the morphine and Percocet "reduced [the defendant's] ability to fully understand what he was about to sign or what he was asked to sign."  Hr'g Tr. 131, Dec. 17, 2007.  Dr. Goldstein could not say how much of an effect the medications had on the defendant, see Hr'g Tr. 157-59, Dec. 17, 2007; he could only say that, because they had some effect, in his opinion, the statement given to the police was not knowingly, voluntarily and intelligently given.  Hr'g Tr. 138, Dec. 17, 2007.

Two experts - Dr. John O'Brien, a psychiatrist and attorney, and Dr. Richard Cohn, a forensic toxicologist and pharmacologist - testified for the government. Dr. O'Brien testified that, based on the medical records, there was absolutely no evidence to support the position that the medications administered to the defendant had any deleterious effect on the defendant. Hr'g Tr. 33, Dec. 17, 2007. Similarly, Dr. Cohn testified that neither the morphine nor the Percocet, or the combination of the two, had any effect on the defendant's cognition at the time he gave his statement to Detective Azzarano. Hr'g Tr. 92-93, Dec. 17, 2007. Like Dr. O'Brien, Dr. Cohn relied on "the hospital notes of record" but also on his experience as a toxicologist and pharmacologist. Dr. Cohn testified that at the time of discharge,

> there would have been some pharmacological effects produced by that medication. It would have been dissolved and be – and would have been circulating. So the fact that he still at that point had clarity of intellect to interact with - - the hospital personnel and understand what was going on. . . . [T]he fact that he had the conscious awareness to interact in that manner once again demonstrates that the cognitive effects are any [sic] adverse sleepiness or unconsciousness were not evident . . .

Hr'g Tr. 88, Dec. 17, 2007. Dr. Cohn further testified that "in the presence of pain . . . [the medications] may actually make [a] person more cognitive of his - - of his surroundings. He may be better able to interact because now he's not being distracted from the pain." Hr'g Tr. 91-92, Dec. 17, 2007.

Finally, Dr. O'Brien highlighted inconsistencies between the defendant's claims that he was, at times, unconscious and what appears in the medical record. For example, the defendant testified on August 8, 2006, and also stated in interviews with Drs. O'Brien and Voskanian, that he was unconscious after the shooting and remembered waking up at the hospital. Hr'g Tr. 22,Dec. 17, 2007. EMS records show, however, that the defendant was conscious, alert and

oriented while en route to the hospital and that he had a perfect GSC of 15 at 4:40 p.m. Furthermore, the defendant's claim that he was "dozing off and mumbling" in the emergency room and later awoke at the police station is not consistent with the emergency room records. Taking into account the record, the inconsistencies, and the incentives of the defendant and of the medical professionals, Dr. O'Brien concluded that the defendant was "not a reliable source of . . . information." Hr'g Tr. 35, Dec. 17, 2007.

### IV.   LEGAL STANDARDS

#### A.   Request for Counsel

Persons subject to custodial interrogation are entitled to receive information regarding their right to remain silent, their right to speak to an attorney, and their right to have a lawyer appointed to assist them if they are unable to afford a lawyer prior to any questioning. Miranda 384 U.S. at 444-45. If, during the course of a custodial interrogation, a defendant requests to speak with an attorney, the interrogation must cease. Edwards v. Arizona, 451 U.S. 477, 482 (1981). Any subsequent statements made without counsel present must be suppressed because "it is presumed that any subsequent waiver . . . has come at the authorities' behest . . . and [is] not the purely voluntary choice of the suspect." Arizona v. Roberson, 486 U.S. 675, 682 (1988).

Where, as in this case, a defendant claims he invoked his right to counsel, the Court must decide whether the defendant "unambiguously request[ed] counsel." Davis v. United States, 512 U.S. 452, 459 (1994). If he did so, the Court must then determine whether defendant was in police custody while he was questioned. See Brosius v. Warden, 278 F.3d 239, 249 (3d Cir. 2002).

Determinations of whether a person was subject to custodial interrogation are made on a case-by-case basis looking objectively at the totality of the circumstances. Stansbury v. California, 511 U.S. 318, 323 (1994) ("[t]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned"); United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999). A person is in custody where he is either formally arrested or where his freedom of movement is restricted to the "'degree associated with a formal arrest.'" Leese, 176 F.3d at 743 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). Where a person has not been arrested, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so." Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir. 1974) (internal quotations and citations omitted). It is also established beyond doubt that a custodial interrogation may occur outside the police station. Leese, 176 F.3d at 743-44 (citing Orozco v. Texas, 394 U.S. 324 (1969)).

Courts consider a variety of factors when determining if a person was in custody, including: (1) whether officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning. United States v. Killingsworth, 118 Fed. Appx. 649, 651 (3d Cir. 2004) (collecting cases) (unpublished).

### B. Waiver of Rights

In Miranda, the Supreme Court held that a defendant may waive his Fifth and Sixth Amendment rights provided that the waiver is made "voluntarily, knowingly and intelligently." 384 U.S. 436, 444, 475 (1966). Courts making a determination on the validity of a waiver may find such a waiver valid only if the totality of the circumstances reveal both an uncoerced choice and an awareness on the part of the defendant "of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). The voluntariness inquiry "is often said to depend on whether 'the defendant's will was overborne' . . . ." Yarborough v. Alvarado, 541 U.S. 652, 668 (2004) (quoting Lynumn v. Illinois, 372 U.S. 528, 534 (1963)). The government bears the burden of proving by a preponderance of the evidence that a defendant waived his Miranda rights knowingly, intelligently, and voluntarily. Colorado v. Connelly, 479 U.S. 163, 168 (1986). An express written waiver of one's Miranda rights is strong proof of the validity of the waiver. See North Carolina v. Butler, 441 U.S. 369, 373 (1979).

## V. ANALYSIS

### A. Request for Counsel

During his treatment at the hospital, the defendant was questioned about the shooting. The hospital interview lasted approximately ten to fifteen minutes. Hr'g Tr. 69, 127, Aug. 8, 2006. Prior to questioning the defendant, detectives received permission from the medical staff to approach the defendant so as to not interfere with his treatment. Hr'g Tr. 67, Aug. 8, 2006.

The defendant claims that while Detective Brady interviewed him at the hospital, Brady

"kept on saying a gun belonged to me. I kept talking about I wanted to talk to my attorney first." Hr'g Tr. 149, Aug. 8, 2006. The defendant's uncle, Gregory Smith, also claims to have overheard the defendant request counsel. Hr'g Tr. 136, Aug. 8, 2006. By contrast, Detectives Azzarano and Brady both testified that the defendant was questioned only as to the shooting and that the defendant never requested counsel. Hr'g Tr. 68, 125-26, Aug. 8, 2006. Detective Azzarano also testified that he did not question the defendant about the gun or the false name while the defendant was in the hospital because he wanted to conduct that interrogation in an organized manner. Hr'g Tr. 96, Aug. 8, 2006. He stated that he wanted to question the defendant on those issues

> . . . where there's a place where I could sit down with a pen and paper and write out my statements rather than try to balance everything on a - - on a clipboard and have him sign while he is in the hospital, I don't think that's appropriate. I try not to interfere with somebody's medical care at a hospital, I would wait until he could be back at a police station and we could do this sitting down in a more organized manner.

Hr'g Tr. 96, Aug. 8, 2006.

The Court finds the detectives to be credible. In light of their testimony, and given the circumstances around the questioning - the short duration of the interview; the fact that detectives requested permission to speak to the defendant so as to not disturb his care; and the fact that defendant was not under arrest - the Court concludes that the defendant was not subject to a custodial interrogation. See Steigler, 496 F.2d at 799. Nothing about the manner of approach or the tone of the interview, or its duration, indicates that the hospital interview was a custodial interrogation. See id. Moreover, the Court credits the detectives' testimony that the defendant voluntarily submitted to questioning. See Killingsworth, 118 Fed. Appx. at 651. Considering

the totality of the circumstances, the Court concludes that the defendant's <u>Miranda</u> rights were not violated by the hospital interview.

### B. Waiver of Miranda Rights

At the police station, the defendant was advised of and waived his <u>Miranda</u> rights. See Gov't Ex. 4. The defendant claims that his waiver was not knowingly and intelligently made because he was in great pain and under the influence of narcotic drugs at the time of his statement. Def.'s Mem. 4. The defendant notes that his statement was obtained at the time when his pain medications were in the peak effect period. See Hr'g Tr. 135, Dec. 17, 2007.

Many federal courts of appeal have addressed similar claims. In <u>United States v. Smith,</u> the Fourth Circuit held that "[t]he test of whether a person is too affected by alcohol or other drugs [to] voluntarily and intelligently [] waive his rights is one of coherence, of an understanding of what is happening." 608 F.2d 1011, 1012 (4th Cir. 1979). In applying this test, or similar standards, numerous courts, including the Third Circuit, have rejected claims that a statement was not voluntary, knowing, or intelligent because it was given under the influence of narcotic drugs. See <u>United States v. Dutkiewicz</u>, 431 F.2d 969 (3d Cir. 1970) (rejecting defendant's claim that waiver was "unintelligent" because he was under the influence of narcotics); <u>United States v. Martin</u>, 781 F.2d 671, 673-74 (9th Cir. 1985) (rejecting defendant's claim that statements were not of "free will and rational choice" because he was in great pain and under the influence of Demerol, a pain-killing medication); <u>United States v. Cristobal</u>, 293 F.3d 134, 141-42 (4th Cir. 2002) (finding defendant's waiver voluntary despite fact that defendant had been given "pain killers and narcotics such as morphine" because defendant was "alert and

coherent" during interview); United States v. Magness, 69 F.3d 872, 874 (8th Cir. 1995) (rejecting defendant's claim of involuntary consent based on fact that defendant had ingested four to five times his prescribed dosage of anti-anxiety medication, where defendant was clear and coherent); United States v. Short, 947 F.2d 1445, 1450 (10th Cir. 1991) (upholding a statement as voluntary where defendant, who had ingested pain medication, demonstrated ability to think and converse freely and intelligently); cf. Ledesma v. Gov't of The Virgin Islands, 159 F. Supp. 2d 863, (D.V.I. 2001) (rejecting defendant's claim that statement was involuntary due to ingestion of Xanax, an anxiety medication, because defendant made no showing that medication impaired his ability to make a conscious waiver).

Guided by this authority, the Court finds that the defendant, despite his ingestion of morphine and Percocet, was coherent and "had an understanding of what [was] happening" when he waived his Miranda rights. To put it another way, the defendant was not too affected by pain or medicine to be fully aware "of the nature of the right being abandoned." Moran, 475 U.S. at 421. Evidence of the defendant's coherence includes, notably, the fact that the defendant stopped the interview at the police station with Detective Azzarano at 7:40 p.m. This fact demonstrates the defendant's ability to comprehend and act on the detective's instruction that he had a right to stop the interview at any time. Moreover, the defendant was able to provide coherent explanations to the detective's questions about why and when he began carrying a gun. Finally, Detective Azzarano testified that during the interrogation the defendant never appeared sleepy or confused, was able to understand and answer questions asked of him, did not mumble or slur his speech, and never complained that he felt unwell. See Hr'g Tr. 75, 80, Aug. 8, 2006.

The medical record also provides evidence that the defendant's cognition was not

impaired at the time of discharge, approximately forty minutes after he was given Percocet. Nurse Mulholland's notes state that the defendant "verbalize[d] understanding and [was] in improved condition" at the time of his discharge. See Gov't Ex. 3. She also testified that the defendant, whom she personally observed and conversed with, "was ambulatory and alert and verbalized that he understood what was, you know, going to happen with his care after leaving the emergency room." Hr'g Tr. 112 114, Aug. 8, 2006. Finally, the medical records show that the defendant signed his discharge papers as "Kevin Johnson." Hr'g Tr. 116, Aug. 8, 2006. This suggests that the defendant, who had twice previously given that false name - first to the police at the subway station and again to Detectives Brady and Azzarano at the Hospital - had the presence of mind to continue using the false name.

Additionally, the testimony of the medical professionals who treated the defendant, as well as that of the government's expert witnesses, establishes that "the type, dosage, and schedule of painkilling narcotic[s] administered to [the defendant] was not sufficient to overbear his will to resist the questioning or impair his rational faculties." See Martin, 781 F.2d at 674. Moreover, the defendant did not receive an excessive quantity or unusual combination of drugs. Id. Dr. Cohn testified that the morphine and Percocet together would have no deleterious effects "at the doses we're referring to." Hr'g Tr. 92, Dec. 17, 2007. He further stated,

> [I]n no way did the administration of the four milligrams of morphine sulfate nor the subsequent administration of the two five milligram Oxycodone preparations in any way adversely affect [the defendant's] ability to interact with his surroundings and intelligently and knowingly make judgments . . . concerning his own welfare. They did not . . . impair his cognitive faculties . . . ."

Hr'g Tr. 92-93, Dec. 17, 2007.

To be clear, the Court does not doubt that a defendant's mental capacity - that is, his

ability to understand the "nature of the right being abandoned and the consequences of the decision to abandon it" - *can* be affected by pain and the effects of pain medication. See United States v. Morris, 287 F.3d 985, 989 (10th Cir. 2002). Dr. Goldstein so testified. It was his testimony that the medications administered to the defendant had some effect - albeit an immeasurable effect - on the defendant's cognition. See Hr'g Tr. 165, 167, Dec. 17, 2007. Nonetheless, in the face of all the other evidence, the Court finds that, in this case, the medications administered to this defendant did not affect his ability to voluntarily, knowingly, intelligently waive his Miranda rights.

### VI.     CONCLUSION

The Court concludes, based on all of the evidence presented, that the defendant was not subject to a custodial interrogation while he was treated at AEMC. The Court further concludes that the government has met its burden of proving by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights at the police station. For these reasons, the defendant's motion to suppress statements is denied.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | NO. 04-672 |
| | : | |
| KENNETH ADAMSON | : | |
| | : | |

**O R D E R**

**AND NOW**, this 16th day of January, 2008, upon consideration of Defendant Kenneth Adamson's Motion to Suppress Statements (Document No. 54, filed April 21, 2006) and the Government's Memorandum in Opposition to Defendant's Motion to Suppress Statement (Document No. 67, filed May 12, 2006), following a hearing on August 8, 2006 and December 17, 2007, for the reasons set forth in the attached Memorandum, **IT IS ORDERED**, that the Defendant's Motion to Suppress Statements is **DENIED.**

BY THE COURT:

/s/ Honorable Jan E. DuBois

JAN E. DUBOIS, J.